RANA McARTHUR, f/k/a Rana King, Indiv. and as Special Adm'x of the Estate of Baby Boy King, Deceased, Plaintiffs-Appellants, v. ST. MARY'S HOSPITAL OF DECATUR, Defendant-Appellee.

Fourth District No. 4—99—0071

Argued July 14, 1999.—Opinion filed September 3, 1999.

330

COOK, J., specially concurring.

Joseph R. Hillebrand and J. Michael Weilmuenster (argued), both of Kassly, Bone, English & Weilmuenster, P.C., of Belleville, for appellant.

Richard J. Wilderson (argued) and April G. Troemper, both of Graham & Graham, Ltd., of Springfield, for appellee.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Plaintiffs, Rana McArthur, individually and as special administratrix of the estate of Baby Boy King, deceased, appeal from an order of the circuit court of Macon County granting summary judgment to defendant, St. Mary's Hospital of Decatur (hospital), as to paragraphs 6(b) through 6(h) of count V of her third-amended complaint. For the reasons that follow, we reverse the judgment of the trial court and remand for further proceedings.

The facts necessary to our resolution of this appeal are not in dispute. Dr. William Wagner provided Rana McArthur's prenatal care at the hospital's prenatal clinic. On September 18, 1995, in the twentieth week of the pregnancy, Dr. Wagner ordered a complete pregnancy ultrasound examination. A hospital-employed technician performed the examination. Permanent recorded images were made of various anatomical structures. These images were reviewed and interpreted by Dr. J. Ambrosini, a radiologist who contracted with the hospital to provide radiological services. Dr. Ambrosini testified at his deposition it was the policy of both the hospital and Dr. Ambrosini's medical group that the hospital's technician had the responsibility to measure the cerebral ventricles and interpret those measurements. The technician who performed the examination for plaintiff found

nothing abnormal about the ventricles. Plaintiffs were aware a hospital technician took the sonogram but the ultrasound report indicates it was interpreted by Dr. Ambrosini. Dr. Ambrosini did not perform his own independent assessment of the ventricles.

Plaintiffs allege the cerebral ventricles had begun to dilate or fill with an abnormal amount of fluid by the time of the ultrasound. When the cerebral ventricles fill with fluid, they have measurements larger than normal for the gestational age in question. The filling of the cerebral ventricles marks the beginning of the development of hydrocephalus, a condition characterized by an enlarged head on the baby. The hydrocephalus went undiagnosed and continued to develop without the knowledge of Dr. Wagner.

On January 7, 1996, plaintiff mother experienced moderate contractions and went to the hospital to determine whether she was in labor. Apparently it was a false labor and she was sent home. While in the hospital, however, a sonogram was taken by Dr. L. Walton, the obstetrician on call. Dr. Walton indicated the baby was in a breech position but stated nothing more.

Plaintiff mother returned to the hospital on January 18 to deliver her baby. Dr. Wagner ordered a flat plate X ray to determine whether the baby was still in a breech position. The X ray was taken and developed by hospital employees. Dr. Wagner testified he was informed by a nurse the X rays indicated the baby was still in a breech position. The X-ray report was made the next day after the radiologist, Dr. T. Ferry, read the X rays. Dr. Wagner testified he first saw the X-ray report the day after delivery.

Dr. Wagner spoke with plaintiff mother and elected to do a vaginal delivery instead of a cesarean-section delivery. During the delivery the baby's legs, trunk, and shoulders were delivered without incident but, because of the abnormally large size of the baby's head caused by the hydrocephalus, the head became trapped in the birth canal causing the umbilical cord to compress, and the baby died. Both Dr. Wagner and plaintiff mother testified this was the first time either was aware hydrocephalus was present.

Plaintiffs brought suit against the hospital and several other defendants on May 23, 1997. The only allegation against the hospital in the original complaint was that on or about January 7, 1996, it "[f]ailed to implement and/or enforce a policy requiring a permanent radiographic image of all ultrasound sonogram examinations be maintained." The allegations against other defendants included the failure to correctly read the sonograms and X rays taken and the failure to diagnose the hydrocephalus from which Baby Boy King suffered. A first-amended complaint, with the same allegation against the

hospital, was filed on August 5, 1997. A second-amended complaint, again with the same sole allegation against the hospital, was filed on August 25, 1997.

Discovery proceeded among the parties. At the February 1998 deposition of Dr. Ambrosini, plaintiffs discovered Dr. Ambrosini never evaluated the cerebral ventricles, but he claimed a hospital technician had that responsibility. That same month the deposition of Dr. Ferry was taken, and plaintiff learned that, although Dr. Ferry dictated a report containing his interpretation of the X ray taken immediately prior to birth, he did not actually see the film until the next day.

On April 2, 1998, plaintiffs moved for leave to file the third-amended complaint on April 2, 1998. Among other things, this complaint added seven new allegations against the hospital:

"(b) Acting by and through its employee, Connie Lanham, failed to properly read and/or interpret the ultrasound performed on September 18, 1995;

(c) Acting by and through its employee, Connie Lanham, failed to appreciate and/or document the fetus' enlarged ventricles on September 18, 1995;

(d) Permitted and/or implemented a policy, practice, guideline[,] or protocol which did not require a properly qualified physician to interpret and/or access the cerebral ventricles for congenital abnormalities during every complete pregnancy ultrasound;

(e) Acting by and through its agents or employees, failed to timely interpret the flat plate X-rays [sic] obtained on January 18, 1996;

(f) Permitted an unqualified person to interpret both the September 18, 1995[,] ultrasound and the January 18, 1996[,] flat plate X-ray [sic];

(g) Acting by and through its agents or employees, misread and/or misinterpreted the radiographic films on January 18, 1996;

(h) Acting by and through its agents or employees, failed to note and/or document fetus; hydrocephalic head evident on January 18, 1996."

Several defendants, including the hospital, objected to the court granting leave to file the amended complaint; one of the grounds asserted was that it included completely new allegations against them that were barred by the statute of limitations. Leave to file the third-amended complaint was granted, however, and the amended complaint was filed on June 25, 1998.

Defendants Dr. Ambrosini and Radiological Associates of Decatur filed a motion for summary judgment arguing plaintiffs could not establish proximate causation as to them. This motion was granted on September 29. Plaintiffs filed a motion to reconsider on October 13. The hospital filed a motion for summary judgment on October 30,

adopting the proximate cause argument of Dr. Ambrosini and Radiological Associates and adding a paragraph arguing the seven new allegations against it were barred by the statute of limitations. Before the trial court ruled on plaintiffs' motion to reconsider its ruling on summary judgment for defendants Dr. Ambrosini and Radiological Associates, plaintiffs settled with all defendants except the hospital. The motion to reconsider was denied on November 17, 1998.

Plaintiffs filed a response to the hospital's motion and memorandum in support of summary judgment on December 3. The response did not include any argument or opposition to the statute of limitations issue. On December 22, the trial court granted summary judgment in favor of the hospital, finding the new allegations alleged different conduct by different people than the original allegations. As such, they presented additional factual bases for the liability of the hospital and did not relate back to the original or previous amended complaints that were filed within the statute of limitations period. A Rule 304(a) (155 Ill. 2d R. 304(a)) finding was made, finding no just reason to delay enforcement or appeal. Plaintiffs then filed a motion to reconsider and addressed the arguments regarding the statute of limitations issue, contending the new allegations against the hospital related back to those in the original or amended complaints filed within the statutory time period. The motion was denied on January 11, 1999, and this appeal followed.

■ The standard of review for the granting of a summary judgment motion is *de novo*. *In re Estate of Hoover*, 155 Ill. 2d 402, 411, 615 N.E.2d 736, 740 (1993). All issues of fact, pleadings, depositions, and admissions must be construed strictly against the movant and liberally in favor of the party opposing the motion. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 271-72, 586 N.E.2d 1211, 1215 (1992).

■ The applicable statute of limitations for a medical malpractice action is found in section 13—212(a) of the Code of Civil Procedure (Code), which provides:

> "[N]o action for damages for injury or death against any *** hospital *** arising out of patient care shall be brought more than 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, or received notice in writing of the existence of the injury or death for which damages are sought in the action, whichever of such date occurs first, but in no event shall such action be brought more than 4 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death." 735 ILCS 5/13—212(a) (West 1998).

■ The acts that were the basis of the seven new allegations against the hospital occurred in September 1995 and January 1996, both more than two years before the third-amended complaint was filed on June 25, 1998. Plaintiffs argue the new allegations related back to the filing of the original complaint, while the hospital argues they do not. Section 2—616(b) of the Code governs the concept of "relation back" and provides in relevant part:

"The cause of action, cross[-]claim[,] or defense set up in any amended pleading shall not be barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action asserted, or the defense or cross[-]claim interposed in the amended pleading grew out of the same transaction or occurrence set up in the original pleading ***." 735 ILCS 5/2—616(b) (West 1998).

■ As the hospital notes, the relation-back doctrine only applies if (1) the original complaint was timely filed and (2) the cause of action in the amended complaint grew out of the same transaction or occurrence as that alleged in the original complaint. *Wolf v. Meister-Neiberg, Inc.*, 143 Ill. 2d 44, 46, 570 N.E.2d 327, 329 (1991). Further, the original complaint should supply a defendant with all of the information necessary to prepare its defense to the subsequently asserted claim. *Flynn v. Szwed*, 224 Ill. App. 3d 107, 111, 586 N.E.2d 539, 543 (1991).

The rationale for this rule is that a defendant will not be prejudiced so long as his attention is directed, within the limitations period, to the facts that form the basis of the claim asserted against him. *Zeh v. Wheeler*, 111 Ill. 2d 266, 273, 489 N.E.2d 1342, 1345 (1986); *Simmons v. Hendricks*, 32 Ill. 2d 489, 495, 207 N.E.2d 440, 443 (1965). Allowing an amended pleading to relate back to the date the original pleadings were filed is the result of a balance struck by the legislature between the preference for resolving disputes on their merits and the prevention of unfair surprise or prejudice to a party resulting from the lack of notice of conduct or conditions upon which liability is asserted against it. *Yette v. Casey's General Stores, Inc.*, 263 Ill. App. 3d 422, 425, 635 N.E.2d 1091, 1093 (1994).

The hospital argues the original complaint and the first two amended complaints all alleged a failure on its part to implement or enforce a policy of permanent storage of radiographic images, while the third-amended complaint added allegations of failure to properly *read* and/or *interpret* sonograms and flat plate X rays. It contends it could not possibly have gained knowledge from the original allegation

that would direct its attention to these new claims. In support of its argument, the hospital cites cases where amendments were held not to relate back because the original allegations did not provide sufficient notice to the defendants of the information necessary to defend the new allegations against them. Those cases, however, involved either sole defendants where the new claims asserted against them were of a completely new nature that they could not have anticipated (*Yette*, 263 Ill. App. 3d 422, 635 N.E.2d 1091; *Weber v. Cueto*, 253 Ill. App. 3d 509, 624 N.E.2d 442 (1993); *Flynn*, 224 Ill. App. 3d 107, 586 N.E.2d 539; *Bailey v. Petroff*, 170 Ill. App. 3d 791, 525 N.E.2d 278 (1988)) or multiple defendants where completely new theories were added that had not been asserted against *any* defendants previously. *Weidner v. Carle Foundation Hospital*, 159 Ill. App. 3d 710, 512 N.E.2d 824 (1987); *Chestnut v. Adeli*, 131 Ill. App. 3d 24, 475 N.E.2d 260 (1985).

In this case, however, the allegations of a failure to properly read and/or interpret sonograms and flat plate X rays were at the heart of plaintiffs' case from the beginning. These allegations were not made against the hospital initially, apparently because the medical records indicated the radiographic images were read or interpreted by Drs. Ambrosini and Ferry and Radiological Associates and not hospital personnel. Not until after plaintiffs discovered hospital personnel apparently were involved in reading and/or interpreting the images at issue were these allegations made against the hospital. Because these allegations were made against the hospital's codefendants and were at the heart of plaintiffs' case, the hospital was aware of them and knew the extent of the involvement of its own personnel.

■ When the relation-back doctrine is applied, the entire record may be examined to determine (1) if a defendant is on notice of a claim prior to the expiration of the statute of limitations and (2) the true facts upon which the amended claim against defendant is based. *Wolf*, 143 Ill. 2d at 46-48, 570 N.E.2d at 328-29. Recently, the court in *Cammon v. West Suburban Hospital Medical Center*, 301 Ill. App. 3d 939, 704 N.E.2d 731 (1998), a case involving multiple defendants, relied on *Wolf* in finding the relation-back doctrine applied where an amended complaint alleged West Suburban hospital, through its agents, had failed to achieve adequate hemostasis following surgery on the decedent. Although the original allegations against West Suburban had been for vicarious liability for the reading of decedent's computed tomography scans, West Suburban had been on notice from the outset of the litigation, prior to the expiration of the statute of limitations, that the plaintiff was claiming a failure to achieve adequate hemostasis following surgery and that this was a proximate cause of the decedent's death because this had been alleged against a codefendant doctor.

Therefore, the court found the relation-back provision of section 2—616(b) applied to this new charge of negligence against West Suburban. *Cammon*, 301 Ill. App. 3d at 947-48, 704 N.E.2d at 737.

◼ We find the situation presented in *Cammon* to be very similar to that presented here. In looking at the entire record, we find the hospital was aware from the beginning of the litigation plaintiffs were asserting negligence in reading or interpreting sonograms on September 18, 1995, and flat plate X rays on January 18, 1996, as this was asserted against Drs. Ambrosini and Ferry. The sonogram and X rays were administered and taken at the hospital in both instances, and the hospital was aware its personnel were involved in at least the administering and taking of them if not the reading and interpretation. We find neither prejudice nor unfair surprise to the hospital in allowing the allegations against it in plaintiffs' third-amended complaint to relate back to the filing of the original complaint, which was clearly within the time allowed by the statute of limitations.

We find the allegations against the hospital are not time-barred because they relate back to the filing of the original complaint. We reverse the trial court's granting of summary judgment on those grounds, and we need not discuss plaintiffs' arguments regarding the application of the discovery rule found in section 13—212(a) of the Code. 735 ILCS 5/13—212(a) (West 1998). We express no opinion on the lack-of-proximate-cause argument advanced by defendant, because the trial court did not rule on that argument.

Reversed and remanded.

MYERSCOUGH, J., concurs.

JUSTICE COOK, specially concurring:

I concur.

The right to amend does not depend on whether the cause of action is substantially similar to that set out in the original pleading; the true inquiry is whether plaintiff is " ' "attempting to slip in an entirely distinct claim in violation of the spirit of the limitations act." ' " *Steinberg v. Dunseth*, 276 Ill. App. 3d 1038, 1044, 658 N.E.2d 1239, 1245 (1995), quoting *Sompolski v. Miller*, 239 Ill. App. 3d 1087, 1091, 608 N.E.2d 54, 57 (1992), quoting *Simmons*, 32 Ill. 2d at 497, 207 N.E.2d at 444 (which in turn quotes O. McCaskill, Illinois Civil Practice Act Annot., at 126-27 (Supp. 1936)). There has been a shift in focus from the identity of the cause of action to the identity of the occurrence or transaction. *Zeh*, 111 Ill. 2d at 279, 489 N.E.2d at 1348. This transactional approach is also employed in the modern *res judi-*

*cata* cases: assertions of different theories of relief arising out of a single group of operative facts will not avoid the bar of *res judicata*. *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 309-11, 703 N.E.2d 883, 892-93 (1998); *cf. Yette*, 263 Ill. App. 3d at 425-26, 635 N.E.2d at 1093-94 (amendment denied, where it would have changed theory from failure to remove ice to one of unnatural accumulation).